**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**AMY BLANKENSHIP,**

　　　　　**Plaintiff,**

**v.**　　　　　　　　　　　　　　　　**Case No.: 3:11-cv-00005**

**MICHAEL J. ASTRUE,
Commissioner of the Social
Security Administration,**

　　　　　**Defendant.**

## MEMORANDUM OPINION

　　　　This is an action seeking review of the decision of the Commissioner of the Social Security Administration (hereinafter the "Commissioner") denying plaintiff's application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1381-1383f. This case is presently before the Court on the parties' Motions for Judgment on the Pleadings. (Docket Nos. 12 and 13). Both parties have consented in writing to a decision by the United States Magistrate Judge. (Docket Nos. 8 and 9).

　　　　The Court has fully considered the evidence and the arguments of counsel. For the reasons that follow, the Court finds that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

## I.　Procedural History

　　　　Plaintiff, Amy Blankenship (hereinafter referred to as "Claimant"), filed for SSI on October 31, 2007, alleging disability due to "depression, nerves, back problems,

arthritis, breathing problems, and vision problems." (Tr. at 16, 190). The Social Security Administration ("SSA") denied the application initially and upon reconsideration. (Tr. at 16). Claimant then requested a hearing before an Administrative Law Judge ("ALJ"), which was held on November 16, 2009 before the Honorable Andrew J. Chwalibog. (Tr. at 32-53). By decision dated December 23, 2009, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 16-24).

The ALJ's decision became the final decision of the Commissioner on November 5, 2010 when the Appeals Council denied Claimant's request for review. (Tr. at 1-3). On January 4, 2011, Claimant brought the present civil action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Docket No. 2). The Commissioner filed his Answer and a Transcript of the Proceedings on March 7, 2011. (Docket Nos. 10 and 11). The parties filed their briefs in support of judgment on the pleadings. (Docket Nos. 13 and 14). Therefore, this matter is ripe for resolution.

## II.   **Claimant's Background**

Claimant was fifty one (51) years old at the time of the administrative hearing. (Tr. at 36). She quit school after the tenth grade and later obtained a GED. (Tr. at 37). Claimant testified that she could read, write, and perform basic arithmetic. (*Id.*). Prior to her alleged disability onset date, Claimant worked as a cable company supervisor and as a caregiver, both in a nursing home setting and in a private home. (Tr. at 46-47). Her work at the cable company, as she performed it, was classified as medium skilled labor, and the caregiver positions were classified as medium to heavy semiskilled work. (Tr. at 47).

## III.   **Relevant Medical Records**

The Court has reviewed the Transcript of Proceedings in its entirety, including

the medical records in evidence, and summarizes below Claimant's medical treatment and evaluations to the extent that they are relevant to the issues in dispute or provide a clearer understanding of her medical background.

### A.    Treatment Records—Prior to Filing SSI Application

Claimant supplied assorted medical records reflecting gynecologic care she received on November 1, 1990 through December 5, 2000.  (Tr. at 254-268). These records reflect that in January 1997, Claimant underwent a total abdominal hysterectomy and bilateral salpingo-oophorectomy and subsequently was prescribed Premarin to relieve the symptoms of menopause. In December 2000, Claimant reported to her gynecologist that she had initiated treatment with a psychiatrist for symptoms of depression, but was not taking any psychotropic medications at that time.  (Tr. at 254).

### B.    Treatment Records—After Filing SSI Application

On February 7, 2009, Claimant presented to the Emergency Department at St. Mary's Medical Center complaining of chest pain.  (Tr. at 359-378).  She reported feeling sick for two weeks and being under a lot of stress. She described her symptoms as including nausea, vomiting, sweating, shortness of breath, palpitations, productive cough, and dizziness. Claimant admitted to smoking one half pack of cigarettes each day and drinking alcohol. She took no medications on a regular basis. On physical examination, the attending physician noted that Claimant appeared alert and nontoxic; her vital signs were normal; her respiratory and cardiac examinations were normal; her abdomen and extremities were normal; her mood was depressed; and her right sinus was tender. Diagnostic tests were ordered, including blood chemistries, a complete blood count, an EKG, a chest x-ray, a throat culture, and cardiac enzymes.  All of the test results were within normal limits.  The emergency physician recommended that

Claimant be admitted for further evaluation of her chest pain, but she opted to leave against medical advice. Accordingly, the physician diagnosed chest pain and bronchitis/COPD. He prescribed Zithromax, an antibiotic, and counseled Claimant to follow-up with her family physician. (*Id.*)

On August 2, 2009, Claimant presented to the Emergency Department at Cabell Huntington Hospital complaining of an injury to her tailbone. (Tr. at 379-387). According to Claimant, she slipped and fell on a rock approximately one week earlier and experienced severe pain in her lower back. An x-ray revealed an acute anterior angulation of Claimant's sacrum that was presumably congenital. The radiologist identified no definite fracture. Claimant was given pain medication and a rubber ring and was instructed to follow up with an orthopedist as necessary.  She was discharged from the Emergency Department one hour after arriving and was noted to be "improved."  (*Id.*)

The final treatment record in evidence is dated September 29, 2009 and memorializes Claimant's initial visit with Dr. Segal, a family physician that Claimant reportedly saw on two occasions. (Tr. at 40, 399-400). Claimant indicated that her reason for coming to Dr. Segal's office was to establish primary care. She provided a subjective history of hypertension, COPD/asthma, anxiety, depression, coccyx pain, low back pain, and a recent myocardial infarction. (Tr. at 399). Claimant indicated that she had not seen a physician in twelve years except for an admission to St. Mary's Medical Center for treatment related to a myocardial infarction and an Emergency Room visit at Cabell Huntington Hospital for a fractured tailbone. She complained of having persistent lower back pain that was burning and stabbing. She stated that she cared for her three year old grandson, but otherwise did not work. On examination, Dr. Segal

noted that Claimant was alert and oriented; her lungs were clear to auscultation; her heart rhythm was regular; she had tenderness in her lower back at the level of L5-S1, but was neurologically intact. He diagnosed coronary artery disease, low back pain, degenerative disc disease, and COPD. Dr. Segal prescribed an inhaler, a pain reliever, and low dose aspirin. He planned to order some screening tests; including, a chest x-ray, EKG, a complete blood count, an electrolyte panel, a fasting lipid profile, a thyroid panel, and an arthritis panel. (*Id.*).

  **C.**  **Agency Assessments**

  On November 27, 2007, David Frederick, Ph.D., performed a psychological evaluation of Claimant at the request of West Virginia's Disability Determination Services ("DDS"). Dr. Frederick completed a client interview and a mental status examination and then administered a Wechsler Adult Intelligence Scale (WAIS-III) and Wide Range Achievement Test (WRAT3) to determine Claimant's intellectual functioning and achievement in reading, spelling, and arithmetic. (Tr. at 276-279). During the interview, Claimant stated that she had problems with her neck, back, knees, and nerves. She described her life as "very dysfunctional." She reportedly quit working because she had no transportation and her "body couldn't handle it." Claimant gave a history of psychological treatment at Prestera Centers for Mental Health for depression and nerves. Claimant described her physical health as "fair," indicating that she took no regular medications, because she could not afford them.  She smoked one and half packs of cigarettes per day. Claimant admitted to drinking beer earlier in the day and stated that on two occasions that month, she had consumed six or more beers at one sitting.  In his record review, Dr. Frederick located an old mental status examination performed by a masters degree-level psychologist in which the examiner diagnosed Claimant as

having Major Depressive Disorder, recurrent and severe, with psychotic features; Posttraumatic Stress Disorder, chronic; and Personality Disorder, not otherwise specified ("NOS"). (*Id.*).

On mental status examination, Dr. Frederick made the following findings: Claimant was oriented x 4; she denied delusions, obsessive thoughts, and compulsive behavior; she had no suicidal or homicidal ideations and her insight was fair; her mood was depressed; her affect was flat; her social interaction was adequate; her thought process, recent memory, remote memory, and psychomotor behavior were within normal limits, but her concentration, judgment, and immediate memory were moderately deficient. Dr. Frederick diagnosed Claimant with Major Depressive Disorder, single episode, severe without psychotic features; and Avoidant Personality Disorder.  He found Claimant to have mild deficiencies in daily activities. (*Id).*

On December 6, 2007, Dr. W. Roy Stauffer performed a physical examination of Claimant at the request of DDS. (Tr. at 280-287). Claimant advised Dr. Stauffer that she had pain in both her upper and lower back, which had lasted for more than ten years, as well as problems with the bones in her neck. She stated that the pain was not constant, but she could not specify any activities that exacerbated the pain. She also complained of arthritis in her back, spine, neck, hands, and knees, which made it difficult for her to bend, lift, or get up and down from sitting/standing positions. Claimant reported taking Tylenol to relieve the pain. Claimant identified having breathing problems, stating that she had been diagnosed with COPD/asthma in the past. She admitted to smoking one to one and half packs of cigarettes each day and denied any hospitalizations related to respiratory problems. In addition, Claimant described blurred vision, although she did not wear corrective lenses. Finally, she complained of a knot on her left wrist, which

varied in size and interfered with her ability to lift and grasp objects.

Dr. Stauffer performed a physical examination of Claimant and found her vital signs, general appearance, and skin to be normal. Her visual acuity uncorrected was 20/50 in both eyes. She had a decreased range of motion in her neck, which was also tender. Her lungs revealed decreased breath sounds with some wheezing. Dr. Stauffer noted tenderness in Claimant's left wrist, although he did not detect a nodule on palpation. He found no other joints to have deformities, nodes, tenderness, redness, or warmth. Neurologically, Claimant's motor strength was normal, sensation was intact, and she could perform fine manipulation and gross dexterous movements with her hands, albeit slowly. She could only partially squat and complained of low back pain when walking on heels and toes. A chest x-ray showed moderate COPD with flat diaphragms and significant hyperinflation. Pulmonary functions studies were consistent with moderate obstructive airway disease. Dr. Stauffer diagnosed chronic thoracic and lumbar back pain, probably secondary to degenerative disease; degenerative joint disease by history; moderate COPD, mostly emphysema; history of decreased visual acuity; and left wrist pain of uncertain etiology, probably degenerative arthritis. He opined that Claimant's main problems included COPD, although she was able to perform adequately on pulmonary function studies, and arthritis of the back and neck. He stated that he did not think Claimant could lift and carry 20 pounds occasionally and 10 pounds frequently, stand, sit or walk six hours, each, out of an eight hour work day. He felt she had unlimited ability to push/pull with her right hand, but not her left, and could not climb ladders and scaffolds. Dr. Stauffer indicated that Claimant could occasionally stoop, crawl, kneel, and crouch and needed to avoid moderate exposure to temperature extremes, fumes, odors, dust, gases and poor ventilation. (*Id.*).

On December 20, 2007, Philip E. Comer, Ph.D., completed a Mental Residual Functional Capacity Assessment and a Psychiatric Review Technique Form. (Tr. at 289-306). He found evidence that Claimant suffered from affective and personality disorders; including, Major Depressive Disorder and Avoidant Personality Disorder. In the "paragraph B" criteria, Dr. Comer felt Claimant had mild restrictions of activities of daily living; moderate difficulties in maintaining social functioning, concentration, persistence, and pace; and one or two episodes of decompensation of extended duration. He detected no evidence of "paragraph C" criteria. Dr. Comer noted that Claimant felt overwhelmed by others and had not held a job longer than six months in the last fifteen years. (*Id.*).

On a function-by-function analysis, Dr. Comer assessed Claimant to have no significant limitations of the following activities: understanding; memory; ability to carry out simple and detailed instructions; ability to sustain an ordinary routine; make simple work-related decisions; ask questions or request assistance; maintain socially appropriate behavior, neatness, and cleanliness; ability to be aware of and avoid hazards; and ability to set realistic goals and make plans independently of others. He found Claimant to have moderate limitations of the following activities: ability to maintain attention and concentration for extended periods of time; ability to work with others without distraction; ability to complete a normal workweek without psychological interruptions; ability to perform at a consistent pace without an unreasonable number of rest periods; ability to interact appropriately with the general public; ability to get along with co-workers without distracting them or exhibiting behavioral extremes; ability to accept criticism from supervisors; ability to respond appropriately to changes in the work environment; and ability to travel to unfamiliar places or use public

transportation. He did not find Claimant to have marked limitations in any functional category. Dr. Comer concluded that Claimant appeared "to have the mental/emotional capacity for work related activity in a low stress/demand work environment with minimal social interaction and/or travel requirements." (Tr. at 291).

On September 24, 2008, psychologist Emily Wilson performed a second consultative mental examination of Claimant. (Tr. at 322-327). Beginning with a client interview, Ms. Wilson learned that Claimant had feelings of depression most of her life with only occasional times of happiness. She admitted to having suicidal ideations and claimed to have attempted suicide in the remote past after her teenage children were taken from her by the State of West Virginia. She complained of feeling anxious around people. She reported increased irritability, low energy, insomnia, feelings of worthlessness and inferiority, crying spells, trouble concentrating, memory problems, and a recent weight loss. She related a past replete with sexual and physical abuse that began as a child and continued into adulthood when she was regularly beaten by her ex-husband. Claimant advised that on one occasion, her ex-husband beat her so brutally that she lost some of her teeth and suffered a concussion. As a result, she periodically got headaches that lasted as long as nine day. Her experiences led to nightmares and feelings of fear when approached unexpectedly by others.

When asked about her psychosocial history, Claimant stated that she was born in Boyd County, Kentucky and was raised in four different states. She had been married five times and had four children, seven grandchildren, and four step-grandchildren. In the past, she had received treatment at Prestera Centers for Mental Health, but could no longer afford that care. She described her vocational background as involving many short term jobs, stating that she usually quit the job after a few months, because she

could not stand to be around people. She described her current activities as watching television and doing light chores around her trailer.

Because of Claimant's history of concussion, Ms. Wilson administered the Cognistat test to gauge Claimant's current brain function.  The scores revealed normal functioning in attention; language-comprehension, repetition and naming; reasoning; calculations; constructions; and orientation. The test indicated that Claimant had a mild to moderate impairment in memory.  Ms. Wilson determined that the scores were valid.

Ms. Wilson's mental status examination of Claimant indicated the following: Claimant's hygiene and grooming were adequate; she was nervous, anxious, depressed, and tearful when discussing her past; her affect was restricted, but her thought process, thought content, and orientation were all normal; she had no hallucinations, obsession, or preoccupations; her insight was fair; her psychomotor behavior was moderately retarded; and her judgment was normal. Ms. Wilson observed that Claimant's immediate memory and concentration were normal, but her recent memory was severely deficient and her remote memory was somewhat impaired. Claimant's persistence and pace were mildly impaired, and her social functioning was moderately deficient.

Ms. Wilson diagnosed Claimant with Major Depressive Disorder, single episode, severe without psychotic features; Posttraumatic Stress Disorder, chronic, based upon her abusive past; Personality Disorder, NOS; and back and neck pain, headaches, stomach problems, colitis, memory problems, and breathing problems, all as reported by Claimant. Ms. Wilson felt that Claimant's prognosis was guarded and recommended medication and therapy to treat Claimant's depression.  (Tr. at 327).

On October 6, 2008, Timothy Saar, Ph.D. completed a Psychiatric Review

Technique Form and Mental Residual Functional Capacity Assessment.  (Tr. at 269-272, 328-341).  Dr. Saar found evidence that Claimant had affective, anxiety-related, and personality disorders; specifically, Major Depressive Disorder, Posttraumatic Stress Disorder, and Personality Disorder, NOS. Rating the "paragraph B" criteria, he determined that Claimant had mild limitations of activities of daily living, moderate limitations of social functioning, concentration, persistence, or pace, and no episodes of decompensation of extended duration.  There was no evidence of "paragraph C" criteria. On a function-by-function analysis, Dr. Saar opined that Claimant was not significantly limited, except in four activities.  He found moderate limitations in Claimant's ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods of time; and the ability to interact appropriately with the general public. (Tr. at 269-70). He found no marked limitations in any functional category. Dr. Saar concluded that Claimant could learn and perform a variety of one-two step commands involving simple instructions with minimal public contact.  (Tr. at 271).

On November 20, 2008, Dr. Roger C. Baisas performed an updated physical evaluation of Claimant with an emphasis on her spine and neurological condition. (Tr. at 342-348). Claimant advised Dr. Biasas that she was unable to work because of low back pain that originated when she was hit by a car at age eight. Her pain was exacerbated by a fall that she had as a teenager. Claimant described her pain as stabbing and sharp and indicated that it radiated down both legs. She stated that her pain worsened with bending, lifting, and twisting.  She rated her low back pain as a 10 and her leg pain as an 8 on a standard pain scale of 1 to 10.

Dr. Biasas noted that Claimant was appropriately dressed and showed no signs of

distress. Her visual acuity was measured as 20/30 without glasses and her hearing was normal. Dr. Biasas examined Claimant's musculoskeletal system, observing that she had a normal gait without antalgia. Her station and pelvic tilt were normal. She could squat, kneel, stand on her tiptoes, and balance steadily on each leg. Claimant's coordination was good, and she had no signs or symptoms of neurological impairment. Her muscle tone, muscle strength, and deep tendon reflexes were also normal. Dr. Biasas asked Claimant to walk down the hallway and noted that she was short of breath after doing so. He listened to her lungs and heard some rales and wheezing at the lung bases. The remainder of the examination was normal. At the conclusion of his assessment, Dr. Biasas diagnosed Claimant as suffering from lumbosacral radiculitis, COPD, depression, and chronic bronchitis.  He opined that her COPD prognosis was guarded.

Based upon this updated evaluation, DDS requested a supplemental physical RFC assessment from Dr. Rafael Gomez on December 8, 2008.  (Tr. at 349-356).  Dr. Gomez reviewed both physical examinations performed on Claimant, as well as the mental assessments.  Rather than completing the form in its entirety, Dr. Gomez merely wrote a summary opinion at the end of the form, stating that Claimant had only a "NON-SEVERE PHYSICAL IMPAIRMENT."  (Tr. at 356).

**IV.  <u>Summary of ALJ's Findings</u>**

Under 42 U.S.C. § 423(d) (5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See *Blalock v. Richardson*, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security Regulations establish a "sequential evaluation" for the

adjudication of disability claims. 20 C.F.R. § 416.920. If an individual is found "not disabled" at any step, further inquiry is unnecessary. *Id.* § 416.920(a).

The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. *Id.* § 416.920(b). If the claimant is not engaged in substantial gainful employment, the second inquiry is whether claimant suffers from a severe impairment. *Id.* § 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 416.920(d). However, if the impairment does not, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 416.920(e). After making this determination, the next step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 416.920(f).  If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to prove, as the final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. *Id.* § 416.920(g); See also, *McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy.  *McLamore v. Weinberger,* 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at every level in the administrative review." 20 C.F.R. § 416.920a. First, the SSA evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. If such impairment exists, the SSA documents its findings. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 416.920a (c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the SSA compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* § 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. *Id.* §416.920a(d)(3).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since October 31, 2007, the date the application was filed. (Tr. at 18, Finding No. 1). Under the second inquiry, the ALJ found that Claimant suffered from the severe impairments of back pain

and anxiety/depression. The ALJ considered Claimant's other medically determinable impairment of chronic obstructive pulmonary disease ("COPD"), but found it to be non-severe. (Tr. at 18, Finding No. 2).

At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any impairment contained in the Listing. (Tr. at 18-20, Finding No. 3). The ALJ then found that Claimant had the following RFC:

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except she can occasionally push/pull with the left upper extremity. She should only occasionally stoop, crouch, kneel, or crawl but never climb ladders or scaffolds. She should avoid even moderate exposure to temperature extremes, dust, smoke, fumes, pollutants and other pulmonary irritants. She has moderate limitation in ability to understand, remember, and carry out detailed instructions, maintain attention/concentration for extended periods of time, and interact appropriately with the general public. She retains the ability to perform a variety of two step commands following simple instructions with minimal public contact.

(Tr. at 20-23, Finding No. 4).

As a result, Claimant could not return to her past relevant employment. (Tr. at 23, Finding No. 5). The ALJ considered that Claimant was forty-nine years old at the time the application was filed, which qualified her as a "younger individual age 18-49," but had subsequently changed category to "closely approaching advanced age." She had a high school education and could communicate in English. (Tr. at 23, Finding Nos. 6 and 7). He noted that transferability of job skills was not an issue, because the Medical-Vocational Rules supported a finding of "not disabled" regardless of transferability of skills. (*Id.*, Finding No. 8). The ALJ then considered all of these factors and, relying upon the testimony of a vocational expert, determined that Claimant could perform jobs such as hand packager, weigher/measurer, machine tender, bench worker, inspector, and grader/sorter, all of which existed in significant numbers in the national and

regional economy. (Tr. at 23-24, Finding No. 9). On this basis, the ALJ concluded that Claimant was not under a disability as defined by the Social Security Act.  (Tr. at 24, Finding No. 10).

## V.    Claimant's Challenges to the Commissioner's Decision

Claimant raises five challenges to the Commissioner's decision:

1.    The ALJ disregarded the effects of Claimant's back pain and anxiety/depression;

2.    The ALJ failed to properly consider Claimant's pain or perform a credibility assessment;

3.    The ALJ failed to consider Claimant's impairments in combinations;

4.    The ALJ failed to develop the record; and

5.    The ALJ failed to rebut the presumption of disability.

## VI.    Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying Claimant's application for benefits is supported by substantial evidence. In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined substantial evidence as:

> Evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972), quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).  Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Court will not re-weigh conflicting evidence, make credibility

determinations, or substitute its judgment for that of the Commissioner. *Id.* Instead, the Court's duty is limited in scope; it must adhere to its "traditional function" and "scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974). The ultimate question for the Court is not whether the Claimant is disabled, but whether the decision of the Commissioner that the Claimant is not disabled is well-grounded in the evidence, bearing in mind that "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner]." *Walker v. Bowen,* 834 F.2d 635, 640 (7th Cir. 1987).

The Court has considered each of Claimant's challenges in turn and finds them unpersuasive. To the contrary, having scrutinized the record as a whole, the Court concludes that the decision of the Commissioner finding Claimant not disabled is supported by substantial evidence.

## VII.  Analysis

### A.     Effects of Claimant's Impairments and Pain

Claimant first argues that the ALJ disregarded the effects of her back pain and anxiety/depression. (Docket No. 12 at 7).  She claims that her records are "replete with visits to medical providers [for] complaints of severe chronic pain" and asserts that the ALJ ignored the effects of this pain on her ability to maintain concentration, persistence and pace. (*Id.*) In contrast to Claimant's contention, her treatment records are sparse; primarily, because she received very little health care in the twelve years preceding the administrative hearing. As a result, the most comprehensive examinations of Claimant were performed by agency consultants. The ALJ thoroughly reviewed and discussed these examinations, as well as the corresponding medical source statements regarding

Claimant's functional capacity. Further, the ALJ took note of Claimant's testimony regarding her daily activities and perceived restrictions arising from pain, depression, and anxiety. Although the ALJ found Claimant's credibility to be poor, he gave her the benefit of the doubt and concluded that her physical condition limited her to light exertional work with additional specific postural and environmental restrictions. (Tr. at 20-22). The ALJ also carefully reviewed the mental residual functional capacity assessments, noting that he adopted the assessment that found the most limitations of Claimant's mental functional capacity and relied upon that assessment when he determined Claimant's RFC.  (Tr. at 20-23).  Accordingly, even a cursory review of the ALJ's decision confirms that he fully understood the effects of Claimant's mental and physical impairments, including her pain and depression, and conducted a disability analysis in the manner and sequence required by the Social Security regulations. Consequently, Claimant's challenge is unfounded.

### B.    The ALJ's Consideration of Claimant's Credibility and Pain

Next, Claimant contends that the ALJ disregarded the medical records and testimony establishing the severity of Claimant's constant pain and, in addition, failed to acknowledge that to her statements regarding the duration and intensity of her arthritis and degenerative disc disease were credible. (Docket No. 12 at 8).  Social Security Ruling 96-7p sets forth the two-step process that an ALJ must employ to evaluate symptoms, including pain, to determine their limiting effects on a claimant. *See, also,* 20 C.F.R. § 416.929. First, the ALJ must establish whether the claimant's medically determinable physical and psychological conditions could reasonably be expected to produce the claimant's symptoms. SSR 96-7P. Once the ALJ finds that the conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity,

persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* Whenever the intensity, persistence or severity of the symptoms cannot be established by objective medical evidence, the ALJ must assess the credibility of any statements made by the claimant to support the alleged disabling effects. The Ruling sets forth the factors that the ALJ must consider in assessing the claimant's credibility, emphasizing the importance of explaining the reasons supporting the credibility determination. The ALJ must take into consideration "all the available evidence," including: the claimant's subjective complaints; claimant's medical history, medical signs, and laboratory findings;[1] any objective medical evidence of pain[2] (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, the location, duration, frequency and intensity of symptoms; precipitating and aggravating factors; any medical treatment taken to alleviate it; and other factors relating to functional limitations and restrictions.[3] *Craig v. Cather*, 76 F.3d 585, 595 (4th Cir. 1996). In *Hines*, the Fourth Circuit Court of Appeals ("Fourth Circuit") stated,

> [a]lthough a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers.

---

[1] *See* 20 C.F.R. §§ 416.929(c)(1) & 404.1529(c)(1).

[2] *See* 20 C.F.R. §§ 416.929(c)(2) & 404.1529(c)(2).

[3] *See* 20 C.F.R. §§ 416.929(c)(3) & 404.1529(c)(3).

453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). The ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations; however, the lack of objective medical evidence may be one factor considered by the ALJ. The Ruling further directs that the credibility determination must be based on a consideration of all of the evidence in the case record. *Id.*

When evaluating whether an ALJ's credibility determination is supported by substantial evidence, the Court is not charged with simply replacing its own credibility assessment for that of the ALJ; rather, the Court must review the evidence to determine if it is sufficient to support the ALJ's conclusions. "In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence . . . or substitute its own judgment for that of the Commissioner." *See Hays v. Sullivan,* 907 F.2d. 1453, 1456 (4th Cir. 1990). Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler,* 739 F.2d 987, 989-990 (4th Cir. 1984), citing *Tyler v. Weinberger*, 409 F. Supp. 776 (E.D.Va. 1976).

Here, the Court finds that the ALJ's credibility assessment of Claimant was consistent with the applicable regulation, case law, and Social Security Ruling and was supported by substantial evidence. 20 C.F.R. § 416.929; SSR 96-7p; *Craig v. Chater,* 76 F.3d 585, 589 (4th Cir. 1996). Significant evidence existed in the record that Claimant's complaints of pain did not correlate with the objective medical findings, her reported activities, and the type and extent of treatment she received.

As stated in his written decision, the ALJ found that Claimant suffered from medically determinable impairments that could reasonably be expected to produce her

complaints of pain; thus, he assessed Claimant's credibility. The ALJ concluded that Claimant's statements as to the intensity, persistence, and limiting effects of her alleged disabilities, separately and in combination, were not credible, because they were inconsistent with the evidence. For instance, the ALJ noted that Claimant complained of severe and constant back pain, yet took no pain medication even when it was prescribed for her. She was diagnosed with COPD and claimed that she could only walk 25 to 30 feet before getting short of breath, yet she smoked over a pack of cigarettes each day. She claimed to have problems with her "nerves," but received no counseling and took no psychotropic medication. (Tr. at 21). The ALJ further pointed out that Claimant provided inconsistent information to the consultants; for instance, she reported to the internist that she drank only occasionally, but admitted to the psychologist that she drank immediately prior to the examination and, at times, drank six or more beers in one sitting. He observed that Claimant received very little medical treatment for her allegedly severe impairments and only began seeing a primary care physician shortly before the administrative hearing. Moreover, Claimant was capable of attending to her personal needs and performing necessary household chores. The objective medical findings also supported the ALJ's credibility assessment. Dr. Biasas found Claimant to have a normal gait, with no pelvic tilt or lordosis. She was able to walk on her tiptoes and heels and could kneel and squat readily. Dr. Biasas saw no evidence of pain inhibition, and Claimant's nerves, reflexes, and muscles were all normal and intact. Similarly, the assessments of the agency psychologists as reflected by their Psychiatric Review Technique Forms were consistent, concluding  that while Claimant had some mild to moderate limitations, she retained the mental/emotional capacity to engage in substantial gainful activities.  (Tr. at 271, 291).

Having scrutinized the ALJ's decision and the evidence in its totality, the Court finds that the ALJ thoroughly considered Claimant's complaints of pain and conducted a proper review of the evidence to assess Claimant's credibility. Consequently, the ALJ's ultimate finding in that regard has substantial evidentiary support.

### C.    Impairments in Combination

Claimant alleges that the ALJ failed to consider her impairments in combination, although Claimant provides no factual support for her conclusory allegation.  (Docket No. 12 at 9). Certianly, the ALJ was required to consider the combined, synergistic effect of all of Claimant's medically determinable impairments, severe and non-severe, to accurately evaluate the extent of their resulting limitations on Claimant. *Walker v. Bowen,* 889 F.2d 47 (4th Cir. 1989).  The social security regulations provide:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.

20 C.F.R. § 416.923.  Where there is a combination of impairments, the issue "is not only the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's ability to engage in substantial gainful activity." *Oppenheim v. Finch*, 495 F.2d 396, 398 (4th Cir. 1974).  The ailments should not be fractionalized and considered in isolation; instead, their cumulative effect should be analyzed to determine the totality of their impact on the claimant's ability to engage in basic work activities. *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983). As the Fourth Circuit stated in *Walker,* "[i]t is axiomatic that disability may result from a number of impairments which, taken separately, might not be disabling, but whose total

effect, taken together, is to render claimant unable to engage in substantial gainful activity." *Walker,* 889 F.2d at 50.

Here, the ALJ fulfilled his obligation to evaluate Claimant's impairments, separately and in combination. As noted in the preceding section, the ALJ explicitly considered Claimant complaints of depression, anxiety, back pain, and COPD and reviewed the functional impact of these impairments on Claimant's ability to engage in activities. Further, as the Commissioner emphasizes, the ALJ posed detailed hypothetical questions to the vocational expert that indisputably included a generous representation of the functional limitations arising from Claimant's musculoskeletal impairments, as well as her mental impairments and her COPD. (Tr. at 47-48). Even after asking the vocational expert to consider Claimant's age, education, past work experiences, postural restrictions, breathing difficulties, and mental/emotional limitations, the vocational expert found job positions at both the light and sedentary exertional levels that Claimant was capable of performing. (*Id.*). Claimant does not contend that the ALJ's hypothetical questions were inadequate, or that the vocational expert was not qualified to render the opinions provided at the hearing, or that the opinions were inconsistent with the Department of Labor's Dictionary of Occupational Titles. Moreover, Claimant's attorney questioned the vocational expert at length and, even after assuming more severe exertional restrictions, the expert concluded that Claimant could perform several job types classified as sedentary.  These positions were only eliminated when the vocational expert assumed, at counsel's urging, that Claimant had "marked" limitations arising from her mental impairments. However, none of the medical sources opined that Claimant had anything more than moderate limitations of her mental/emotional ability to engage in substantial gainful activity. Accordingly, the

Court finds that the ALJ properly considered Claimant's impairments in combination and received expert testimony upon which to base his determination that Claimant's combined impairments did not render her disabled as defined in the Social Security Act.

### D.   Duty to Develop the Record

According to Claimant, the ALJ failed to develop the record regarding Claimant's impairments. However, she provides no facts or focused argument in support of this criticism. (Docket No. 12 at 9-10). In *Cook v. Heckler*, 783 F.2d 1168 (4th Cir. 1986), the Fourth Circuit acknoweldged that an ALJ has a "responsibility to help develop the evidence." *Cook*, 783 F.2d at 1173. The Court stated that "[t]his circuit has held that the ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely on evidence submitted by the claimant when that evidence is inadequate ... [the ALJ's] failure to ask further questions and to demand the production of further evidence, as permitted by 20 C.F.R. § 404.944, [amounts] to neglect of his duty to develop the evidence." *Id.* Nevertheless, an ALJ is not required to act as a claimant's counsel, *Clark v. Shalala,* 28 F.3d 828 (8th Cir. 1994), and has the right to assume that counsel is presenting the claimant's strongest case for benefits. *Nichols v. Astrue,* 2009 WL 2512417 *4 (7th Cir. 2009), citing *Glenn v. Sec'y of Health and Human Servs.,* 814 F.2d 387,391 (7th Cir. 1987). Simply stated, the ALJ's is to insure that the record contains sufficient evidence upon which to make an informed decision. *Ingram v. Commissioner of Social Security Administration,* 496 F.3d 1253, 1269 (11th Cir. 2007); *See also, Weise v. Astrue,* 2009 WL 3248086 (S.D.W.Va.). When considering whether the record is adequate to support a judicious administrative decision, the Court looks for evidentiary gaps that are reasonably likely to result in "unfairness or clear prejudice" to the claimant. *Marsh v. Harris,* 632 F.2d 296, 300 (4th

Cir. 1980).

Accordingly, to prevail in this case on the argument that the ALJ failed to develop the record, Claimant must provide a factual foundation upon which the Court can perceive a gap in the evidentiary record that is prejudicial to Claimant. "To establish prejudice, a claimant must demonstrate that he or she could and would have adduced evidence that might have altered the result." *Carey v. Apfel*, 230 F.3d 131, 142 (5th Cir. 2000). Only under these conditions may the Court remand this case for an inadequate record.

Here, evidence of Claimant's physical and psychological diagnosis and treatment was sparse, because Claimant rarely sought medical care. Claimant makes no reference to the existence of additional evidence that might have altered the result of the ALJ's decision. To the contrary, Claimant confirmed in statements made on September 29, 2009 to her treating physician, Dr. Segal, that she had no primary care physician and had only seen a physician twice in the preceding twelve years. The SSA collected the relevant records pertaining to those visits, and the ALJ reviewed them as part of the determination process. In light of the scarce treatment records, the SSA also obtained comprehensive examinations and medical source statements from agency consultants, which were closely examined and analyzed by the ALJ. He then thoroughly questioned Claimant at the hearing about her reasons for not working and the impact of her impairments on her daily life. As such, the ALJ did all that he could to develop the record and no prejudicial evidentiary gaps are apparent. The records before the ALJ unquestionably constituted an adequate basis upon which to make a disability determination. Therefore, the Court finds no merit to Claimant's contention that the ALJ failed to develop the record.

### E.       Presumption of Disability

Claimant's final contention is that the ALJ did not carry his burden to produce evidence sufficient to rebut the "presumption of disability." (Docket No. 12 at 10-11). The Court finds this contention to be equally without merit. Claimant is ultimately responsible for proving that she is disabled, and this responsibility never shifted to the Commissioner, but remained with Claimant. As a result, she bore the burden of providing medical evidence to the Commissioner that established the severity of her impairments. 20 C.F.R. § 416.912(a). *See Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981); 42 U.S.C.A. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require.")  While the Commissioner had a duty to go forward with the evidence at the fourth step of the evaluation, Claimant retained "the risk of non-persuasion." *Seacrist v. Weinberger*, 538 F.2d 1054, 1056 (4th Cir. 1976).

At the fourth step of the sequential disability evaluation, the SSA recognizes that when a claimant proves the existence of severe impairments, which prevent the performance of past relevant work, the claimant has established a *prima facie* case of disability. The burden of production then shifts to the Commissioner to supply evidence demonstrating that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences.  20 C.F.R. §§416.920(g); *See also*, *McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983).  The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job,

and (2) that this job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d 572, 574 (4th Cir. 1976).

In order to carry this burden, the Commissioner may rely upon medical-vocational guidelines listed in Appendix 2 of Subpart P of Part 404 ("grids"), "which take administrative notice of the availability of job types in the national economy for persons having certain characteristics, namely age, education, previous work experience, and residual functional capacity." *Grant v. Schweiker*, 699 F.2d 189, 191-192 (4th Cir. 1983); See also 20 C.F.R. § 416.969. However, the grids consider only the "exertional" component of a claimant's disability in determining whether jobs exist in the national economy that the claimant can perform. *Id.* For that reason, when a claimant has significant nonexertional impairments or has a combination of exertional and nonexertional impairments, the grids merely provide a framework to the ALJ, who must give "full individualized consideration" to the relevant facts of the claim in order to establish the existence of available jobs. *Id.* In those cases, the ALJ must prove the availability of jobs through the testimony of a vocational expert. *Id.* As a corollary to this requirement, however, the ALJ has the right to rely upon the testimony of a vocational expert as to the availability of jobs types in the national economy that can be performed by the claimant so long as the vocational expert's opinion is based upon proper hypothetical questions that fairly set out all of the claimant's severe impairments. *See Walker, 8*89 F.2d at 50-51 (4th Cir. 1989).

In the present case, the ALJ recognized that Claimant's impairments resulted in a combination of exertional and nonexertional impairments. Therefore, he properly relied upon the testimony of a vocational expert in determining that jobs existed in significant numbers in the national and regional economy that Claimant could perform. (Tr. at 50-

52).  Claimant does not argue that the vocational expert's opinions were based upon incomplete or inaccurate information. Indeed, the vocational expert was present throughout the administrative hearing and had the opportunity to listen to Claimant's descriptions of her mental and physical conditions and their resulting functional limitations. Despite the totality of Claimant's restrictions, the vocational expert found light and sedentary exertional level positions that Claimant could perform. (Tr. at 50-51). Under these circumstances, the Court finds that the ALJ fulfilled his obligation to produce expert testimony on the subject of job availability individualized to the Claimant.  Consequently, the decision of the Commissioner that Claimant was not under a disability is supported by substantial evidence.

## VIII.  **Conclusion**

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision **IS** supported by substantial evidence. Therefore, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to transmit copies of this Order to all counsel of record.

**ENTERED:**  January 27, 2012.

Cheryl A.  Eifert
United States Magistrate Judge